**REVISED August 11, 2015**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————

No. 13-31281

————

United States Court of Appeals
Fifth Circuit

**FILED**

July 24, 2015

Lyle W. Cayce
Clerk

JOSEPH R. WILCOX; LISA WILCOX,

Plaintiffs–Appellants

v.

WILD WELL CONTROL, INCORPORATED; SUPERIOR ENERGY
SERVICES, INCORPORATED,

Defendants–Appellees

------------------------------------------------------------------------------------------------------------

Cons. with 14-30137

JOSEPH R. WILCOX; LISA WILCOX,

Plaintiffs–Appellants

v.

MAX WELDERS, L.L.C.,

Defendant–Appellee

WILD WELL CONTROL, INCORPORATED; SUPERIOR ENERGY
SERVICES, INCORPORATED,

Defendants–Appellees–Appellants

No. 13-31281

Appeals from the United States District Court
for the Eastern District of Louisiana

Before DENNIS, PRADO, and HIGGINSON, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This appeal arises from injuries sustained by Plaintiff–Appellant Joseph R. Wilcox while welding on an offshore platform. Wilcox, an employee of Defendant–Appellee Max Welders, L.L.C., was working as the borrowed employee of Defendant–Appellee–Appellant Wild Well Control, Incorporated, a subsidiary of Defendant–Appellee–Appellant Superior Energy Services, Incorporated. Wilcox sued the Defendants under, *inter alia*, the Jones Act. Superior and Wild Well filed a cross-claim for indemnity from Max Welders pursuant to a Master Service Agreement (MSA) or, in the alternative, Vessel Boarding, Utilization and Hold Harmless Agreement (VBA) between Superior and Max Welders. The district court granted summary judgment to all Defendants on the Jones Act claims because it found that Wilcox is not a Jones Act seaman and granted summary judgment to Max Welders on indemnity because 1) the MSA was void under Louisiana law and 2) the VBA did not apply to Wilcox's work. Wilcox, Superior, and Wild Well appeal these decisions. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Max Welders is a contractor that provides various offshore construction, fabrication, and repair services. Max Welders employed Wilcox as a welder. During his employment with Max Welders, Wilcox worked in numerous locations, including a fabrication yard in Louisiana and on various rigs, barges, and vessels owned by Max Welders' customers. Wilcox concedes that during

2

No. 13-31281

his entire employment with Max Welders, he spent less than thirty percent of his time in service of any one vessel or group of vessels.

Energy Resource Technology GOM, Incorporated (ERT) hired Wild Well—a subsidiary of Superior—to decommission a well in the Gulf of Mexico ("the ERT job"). Wild Well contracted with Max Welders to provide welders to assist. Wilcox was one of the welders sent to work on the ERT job, which was expected to last for approximately two months. During this time, Wilcox was required to live on Wild Well's barge, the D/B SUPERIOR PERFORMANCE, which was on site at the well to provide support to the decommissioning work. Superior previously owned the D/B SUPERIOR PERFORMANCE. Wilcox allegedly sustained injuries on June 5, 2012, when gasses exploded while he was welding inside on the well platform. Wild Well concedes that, at the time of the accident, Wilcox was its borrowed employee.

Wilcox and his wife sued Max Welders, Superior, and Wild Well for negligence under the Jones Act, 46 U.S.C § 30104, and general maritime law (GML) unseaworthiness, or alternatively for vessel negligence against the D/B SUPERIOR PERFORMANCE under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b). Superior and Wild Well jointly filed a cross-claim alleging that Max Welders had agreed to indemnify and hold harmless Superior and its subsidiaries against any personal-injury claims brought by Max Welders' employees pursuant to the 2004 MSA between Max Welders and Superior. They argued, in the alternative, that Max Welders owed them indemnity pursuant to a 2010 VBA between Superior and Wild Well.

Max Welders moved for summary judgment on Wilcox's Jones Act and GML claims, asserting that Wilcox was not a seaman. Max Welders also moved for summary judgment on Superior and Wild Well's indemnity cross-claim,

3

No. 13-31281

contending that the MSA and VBA did not provide indemnity for Wild Well's demolition work for a third party. Superior and Wild Well then filed a cross-motion for summary judgment on their indemnity claims. The district court granted summary judgment to Max Welders on Wilcox's Jones Act and GML claims as well as on Superior and Wild Well's indemnity claims.

Superior and Wild Well later moved for summary judgment on Wilcox's Jones Act and GML claims, arguing that if Wilcox was not a seaman with respect to his employer, Max Welders, he was also not a seaman with respect to his borrowing employer, Wild Well. The district court granted this motion. The district court later granted summary judgment to Superior and Wild Well on Wilcox's remaining claims for vessel negligence under the LHWCA.

These consolidated cases encompass two appeals. First, Wilcox appeals the grant of summary judgment for Wild Well on Wilcox's Jones Act and GML claims based on his seaman status.[1] Second, Wild Well and Superior appeal the grant of summary judgment for Max Welders on indemnity.

## II. DISCUSSION

This Court has jurisdiction to review a district court's final judgment pursuant to 28 U.S.C. § 1291. We review de novo a district court's grant of summary judgment, viewing "all facts and evidence in the light most favorable to the non-moving party." *Juino v. Livingston Par. Fire Dist. No. 5*, 717 F.3d 431, 433 (5th Cir. 2013). We apply the same standard as the district court in the first instance. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[1] Wilcox does not appeal the grant of summary judgment on his LHWCA claims.

as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## A.    Wilcox's Jones Act Claims

The district court granted summary judgment for Wild Well and Superior because it found that Wilcox was not a Jones Act seaman. The Supreme Court has articulated a two-prong test to determine seaman status under the Jones Act: 1) "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission,'" and 2) "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995) (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355 (1991)).

At issue in this appeal is the substantial-connection prong.[2] The "fundamental purpose" of this inquiry "is to . . . separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation." *Id.* at 368. "Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." *Id.* at 361. Following *Barrett v. Chevron U.S.A., Inc.*, 781 F.2d 1067 (5th Cir. 1986) (en banc), we have generally "declined to find seaman status where the employee spent less than 30 percent of his time

---

[2] The district court found a genuine issue of material fact regarding the contribution prong. Wild Well does not contest this finding.

No. 13-31281

aboard ship." *Chandris*, 515 U.S. at 367. The Supreme Court deemed this "an appropriate rule of thumb," but noted that "departure from it will certainly be justified in appropriate cases." *Id.* at 371.

Generally, the status of an employee who splits time between land and a vessel is "determined in the context of his *entire* employment with his current employer." *Barrett*, 781 F.2d at 1075 (internal quotation marks omitted); *see also Chandris*, 515 U.S. at 370–71. But if the employee "receives a new work assignment before his accident in which either his essential duties or his work location is *permanently changed*, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new job." *Barrett*, 781 F.2d at 1075–76 (emphasis added); *see also Chandris*, 515 U.S. at 371–72 ("[W]e see no reason to limit the seaman status inquiry . . . exclusively to an examination of the overall course of a worker's service with a particular employer. When a maritime worker's basic assignment changes, his seaman status may change as well."). This reassignment exception applies only when an employee has "undergone a *substantial change* in status, not simply [by] serv[ing] on a boat sporadically." *Becker v. Tidewater, Inc.*, 335 F.3d 376, 389 (5th Cir. 2003) (emphasis added).

We addressed the *Barrett* reassignment exception in a borrowed-employee context similar to Wilcox's in *New v. Associated Painting Services, Inc.*, 863 F.2d 1205 (5th Cir. 1989).[3] The plaintiff worked for a painting company that sent employees to offshore drilling rigs and oil platforms. *Id.* at 1207. The employee was regularly assigned to different vessels owned by unrelated entities. *Id.* One week into an assignment to a drilling rig as a

---

[3] Although *New* was decided before the Supreme Court's seminal decision in *Chandris*, we applied the *Robison* seaman-status test, which the Court "essentially accepted" in *Chandris. Nunez v. B&B Dredging, Inc.*, 288 F.3d 271, 274–75 (5th Cir. 2002). Thus, *New* remains binding. *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).

No. 13-31281

borrowed employee, the plaintiff sustained injuries in an accident. *Id.* The employee argued that he was a seaman with regard to the painting company and the borrowing employer. *Id.* Although he did not satisfy the thirty-percent requirement based on his entire employment with the painting company, the employee asserted that the court should look only to the time he worked for the borrowing employer because as a matter of law, he contended, the Barrett exception applied to his work as a borrowed employee. *Id.* at 1208–09. We held 1) that the plaintiff's status as a borrowed employee did not make him a Jones Act seaman; and 2) that because the summary-judgment evidence showed no permanent change to his essential work duties or work location, his status must be determined by looking to his entire employment with the painting company. *Id.*[4]

Wilcox argues that the district court erred in its substantial-connection analysis by refusing to determine Wilcox's status by reference to his period of employment with Wild Well, rather than his entire employment with Max Welders.[5] Wilcox disclaims reliance on the Barrett exception, and for good reason—there is no evidence in the record to support application of the

---

[4] We followed a similar analysis in a post-*Chandris* case. In *Becker v. Tidewater, Inc.,* 335 F.3d 376 (5th Cir. 2003), we refused to apply the reassignment exception to a land-based worker temporarily reassigned to a vessel. *Id.* at 390–91.

[5] Wilcox devotes a substantial portion of his brief to arguing that the district court granted summary judgment based on dictum from *New v. Associated Painting Services, Inc.*, 1987 WL 4944 (E.D. La. May 8, 1987). He suggests that the *New* district court created, and the district court in this case applied, a *per se* rule that a borrowed employee's seaman status must always be determined by looking at the time spent working for the original employer.

This argument mischaracterizes the district court's summary-judgment analysis in this case. The district court carefully analyzed and applied our *New* opinion, which affirmed the lower court. Wilcox also ignores the context of the summary-judgment order: in its prior order granting summary judgment to Max Welders, the district court had already addressed the argument that Wilcox's status should be determined based on the time spent as Wild Well's borrowed employee. When the district court disposed of Wild Well's summary judgment motion, the only remaining question was "whether the seaman status finding that was made with respect to Max Welders should also be applied to Wild Well."

7

No. 13-31281

reassignment exception in this case. Wilcox's case presents facts that are strikingly similar to those in *New*. Like the borrowed employee in *New*, Wilcox was not permanently reassigned to work on Wild Well's vessel—the project was expected to last for approximately two months. Nor did his essential duties change—his primary duty continued to be welding. Wilcox does not point to any evidence suggesting a "fundamental change in status," *Becker*, 335 F.3d at 390, which would allow us to assess the substantial-relation prong with sole reference to Wilcox's time as a borrowed employee with Wild Well.

Conceding that the *Barrett* exception does not apply here, Wilcox instead asserts that he "started a new job with a new employer when he began work as Wild Well's borrowed employee," making Wild Well his "current employer," *Chandris*, 515 U.S. at 366, for the purposes of the seaman-status inquiry. Thus, Wilcox concludes, he has satisfied the substantial-connection prong because he spent more than thirty percent of his time with Wild Well aboard a vessel. He concedes that there is no direct support for this conclusion but argues that it is "suggested" by other pre-*Chandris* cases that recognize that a borrowed employee can become a seaman with regard to his borrowing employer. We decline to adopt such a rule.

The Supreme Court has recognized that in determining seaman status, "it [is] preferable to focus upon the essence of what it means to be a seaman and to eschew the temptation to create detailed tests to effectuate the congressional purposes, tests that tend to become ends in and of themselves." *Id.* at 369. Our thirty-percent rule and the *Barrett* reassignment exception "get[] at the . . . basic point [that] [t]he Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to the special hazards and disadvantages to which they who go down to sea in ships are subjected." *Chandris*, 515 U.S. at 370 (internal quotation marks omitted). We

No. 13-31281

do not here adopt a bright-line rule that courts performing the seaman-status inquiry must always look to an employee's entire employment with his nominal employer rather than his borrowing employer.[6] Nevertheless, we also decline to adopt a rule that borrowed-employee status automatically requires courts look only to his period of employment with the borrowing employer.[7]

Wilcox supports his argument with *Roberts v. Williams–McWilliams Co.*, 648 F.2d 255 (5th Cir. 1981), in which this Court held that a borrowed employee was a seaman with regard to his borrowing employer. *See id.* at 262. In *Roberts,* we found "no reason to distinguish [the plaintiff] because he received his paycheck from the [nominal employer]." *Id.* at 262. There, the employee was under the complete control of the borrowing employer; he was sent to work on the vessel for an indefinite period of time and was expected to remain on the vessel until the completion of the project. *Id.* Importantly, the employee was assigned to work for the borrowed employer on his *second day* of work for the nominal employer. *Id.* at 257–58. Thus, the distinction at issue here—entire period of employment versus period of employment with the borrowing employer—was inconsequential in *Roberts*.

Here, there is good reason to distinguish Wilcox from Wild Well's permanent employees. While employed by Max Welders, Wilcox worked for 34 different customers on 191 different jobs, both offshore and onshore. He was

---

[6] Such a rule would enable employers to contract around Jones Act rights. *See Spinks v. Chevron Oil Co.*, 507 F.2d 216, 225 (5th Cir. 1975) (rejecting a rule that would "result in defeating Jones Act rights through contractual manipulations"), *overruled on other grounds by Gautreaux v. Scurlack Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc).

[7] Such a rule would be inconsistent with our reasoning in *New*—in which, after finding that the *Barrett* exception did not apply, we concluded that the district court "applied the proper legal standard" by reviewing the borrowed employee's entire employment with his nominal employer. 863 F.2d at 1208–09. Such a rule would also result in workers walking "into and out of [Jones Act] coverage in the course of his regular duties." *See Chandris*, 515 U.S. at 363.

assigned to work for Wild Well on the D/B SUPERIOR PERFORMANCE for one specific project, which had a clear end date only two months after it began. Moreover, testimony indicates that, although crew would usually stay on a vessel for an entire job, they could request relief and leave the vessel before the job was complete.

Focusing on the "essence of what it means to be a seaman," *Chandris*, 515 U.S. at 369, we cannot say Wilcox demonstrated a genuine issue of material fact from which a reasonable jury could conclude that he qualifies for seaman status under the Jones Act. Therefore, we affirm the district court's grant of summary judgment to Wild Well on Wilcox's Jones Act claims.

## B.    The Indemnity Cross-Claims

We now turn to the district court's grant of summary judgment to Max Welders on Superior and Wild Well's indemnity claims. Because we affirm summary judgment on Wilcox's remaining claims against all Defendants, we need only address Max Welders' liability for defense costs. Superior and Wild Well filed a cross-claim for indemnity from Max Welders pursuant to the MSA or, in the alternative, the VBA between Superior and Max Welders.

### *1. The MSA*

The MSA that Max Welders and Superior entered into in April 2004 contains an indemnity-and-defense provision. The district court assumed without deciding that the MSA applied to Wilcox's work and held the MSA's "obligations to defend [or] indemnify . . . are void and unenforceable" under the Louisiana Oilfield Anti-Indemnity Act (LOAIA).

Superior and Wild Well argue that this was error with reference to two key cases. In *Meloy v. Conoco, Inc.*, 504 So. 2d 833 (La. 1987), the Louisiana Supreme Court made clear that the LOAIA "does not apply where the indemnitee is not negligent or at fault," *id.* at 839. Thus, "the indemnitor's

obligation for cost of defense cannot be determined until there has been a judicial finding that the indemnitee is liable or that the charges against it were baseless." *Id.* In *Melancon v. Amoco Production Co.*, 834 F.2d 1238 (5th Cir. 1988), we affirmed summary judgment for a borrowing employer on an employee's LHWCA claim. *Id.* at 1247–48. Applying *Meloy*, we held that the district court erred in finding that the LOAIA voided the borrowing employer's indemnity agreement with the nominal employer and awarded the borrowing defense costs. *Id.* at 1248.

Max Welders argues that Wild Well and Superior have waived their argument that they are entitled to attorneys' fees under *Meloy* and *Melancon* because they did not present this argument to the district court. Superior and Wild Well counter that they could not raise their argument because they "were not conclusively determined to be 'not negligent'" until the district court dismissed Wilcox's final claim against them on February 14, 2014, "*after* the district court's Scheduling Order deadline" for pretrial motions.

"An argument not raised before the district court cannot be asserted for the first time on appeal." *XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 513 F.3d 146, 153 (5th Cir. 2008) (citing *Stokes v. Emerson Elec. Co.*, 217 F.3d 353, 358 n.19 (5th Cir. 2000)). A party preserves an argument only if it is "raised to such a degree that the trial court may rule on it." *Id.* (quoting *Butler Aviation Int'l, Inc. v Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119, 1128 (5th Cir. 1993)), *abrogated on other grounds by Tex. Truck Ins. Agency, Inc. v. Cure* (*In re Dunham*), 110 F.3d 286 (5th Cir. 1997).

Superior and Wild Well did not have to wait for a conclusive determination of their liability to raise *Meloy* and *Melancon*. In its indemnity motion for summary judgment, Max Welders argued that the MSA's indemnity agreement was void under the LOAIA. Superior and Wild Well filed a cross-

motion for summary judgment, but only argued that the LOAIA did not govern the MSA because it did not "pertain to a well." They could have argued in their opposition that *Meloy* and *Melancon* precluded the district court from determining the validity of the indemnity provision before liability was determined, but they did not.[8] Because Wild Well and Superior failed to raise the *Meloy–Melancon* argument at the summary-judgment stage, we conclude that they have waived the argument on appeal. *See Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 990 n.11 (5th Cir. 2001) ("As a general rule, arguments . . . not presented in the district court in connection with a summary judgment motion are waived on appeal and the appellate court will be unable to consider these materials in its review of the district court's decision." (quoting in a parenthetical 11 James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.41[3][c] (3d ed. 1997))).

Because Superior and Wild Well have waived their argument for attorneys' fees based on *Melancon* and *Meloy*, we affirm the district court's summary-judgment holding that the MSA was void under the LOAIA.

### 2. The VBA

Superior and Wild Well also argue that they are entitled to defense costs and indemnity under the Vessel Boarding, Utilization and Hold Harmless Agreement (VBA) between Superior and Max Welders.[9] The district court

---

[8] Superior and Wild Well did cite to *Meloy* in the law section of their cross-motion for summary judgment on indemnity, noting that "[i]f the LOAIA applies to the Superior/Max MSA, then the defense, indemnity and insurance provisions will be void as a matter of public policy if there is any negligence on the part of Superior/Wild Well." (citing *Meloy*, 504 So. 2d 833). However, in the pertinent section of their brief, they only argue that the LOAIA does not apply because the agreement does not pertain to a well. This was most likely a strategic choice: because they also sought summary judgment on indemnity, the *Meloy–Melancon* issue could have precluded summary judgment in their favor.

[9] Max Welders points out that the VBA is not countersigned by Superior, and argues "[t]his alone renders the VBA inapplicable." However, it cites no authority for this

rejected this argument, but it did not distinguish between indemnity for Wild Well and indemnity for Superior in its analysis. After concluding that the VBA did not apply to Wild Well, the district court granted summary judgment to Max Welders against *both* Wild Well and Superior. We address each indemnity issue in turn.

The VBA states it was "executed by Contractor [Max Welders] for the purpose of obtaining access from Owner [Superior] to vessels owned, chartered and/or operated by Owner . . . in order to allocate the risks and liabilities arising out of Owner granting to Contractor such access." It further provides:

> Contractor agrees to defend, indemnify and hold Owner harmless from and against any claims, losses, or demands of any kind arising as a result of personal injury, death or disease, that may be asserted by Contractor . . . or on behalf of any of its or their employees . . . no matter how occasioned . . . .

### a. Indemnity for Wild Well

Before the district court, Superior and Wild Well argued that the VBA was intended as an addendum to the MSA that provided indemnity in connection with the D/B SUPERIOR PERFORMANCE, regardless of whether it was owned by Wild Well or Superior.[10] They conceded that the plain language of the agreement did not reflect this intent, but argued, based on parol evidence, that the VBA should be reformed to reflect that intent. They asserted that because this was a reformation issue, rather than an ambiguity issue, the parol evidence could be considered. The district court found the contract to be unambiguous and found the defendant's reformation argument

---

proposition. We find this argument to be inadequately briefed and abandoned. *See* Fed. R. App. P. 28(a)(8); *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993).

[10] Superior owned the D/B SUPERIOR PERFORMANCE when the VBA was signed in 2010 but transferred the vessel to Wild Well in 2011, prior to Wilcox's injury.

to be an "end-run" around the parol evidence rule. On appeal, Superior and Wild Well raise nearly identical arguments.

"Reformation is an equitable remedy used to correct errors or mistakes in contracts." *Am. Elec. Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 287 (5th Cir. 2009) (internal quotation marks omitted). The party seeking reformation bears the burden of establishing mutual error in the contract's creation. *Id.* Ordinarily the party must only show mistake by a preponderance of the evidence; but when a party seeks to reform a provision "to provide coverage for a 'substantially different and greater risk' than expressly covered, the party must demonstrate a mutual error by clear-and-convincing evidence." *Id.* at 287 n.4 (quoting *Samuels v. State Farm Mut. Auto. Ins. Co.*, 939 So. 2d 1235, 1240 (La. 2006)).

In *American Electric Power Co. v. Affiliated FM Insurance Co.*, we interpreted an insurance agreement that had been adopted by the defendant insurance company through a "prior loss" clause in its coverage agreement with the plaintiff. *Id.* at 284–85. The clause obligated the defendant to cover a loss if the prior insurance agreement did. *Id.* The prior agreement covered losses for the company and "any subsidiary *corporation* now existing or hereafter created or acquired." *Id.* at 285. The question was whether this provision covered subsidiary LLCs. *Id.* Before the district court, the plaintiff sought to introduce affidavits from the original parties to the agreement evincing that they intended to include LLCs in the coverage. *Id.* The district court, granting summary judgment for the defendant insurance company, found that "corporation" was unambiguous and, therefore, "struck the affidavits as impermissible parol evidence." *Id.* The plaintiff company filed a Rule 59(e) motion seeking reformation to match the original intent of the parties; the district court denied the motion. *Id.*

14

No. 13-31281

This Court agreed that "corporation" was unambiguous and parol evidence was properly excluded. *Id.* at 286–87. We also affirmed the refusal to reform the agreement in part because "the use of the term 'corporation' is not the type of 'error' that reformation is intended to remedy." *Id.* at 288. We noted that the plaintiff "argue[d] that the original parties had a broader-than-usual meaning in mind when they purposefully included the word. In effect, [the plaintiff] attempt[ed] to make an end-run around the parol-evidence rule by framing its argument as a request for reformation." *Id.*

American Electric defeats Superior and Wild Well's reformation argument. The VBA defines "Owner" as "Superior Energy Services, L.L.C." There is nothing ambiguous about this term, which Superior and Wild Well now contend must be read to include all companies affiliated with Superior. The agreement clearly covers "vessels owned, chartered and/or operated by" Superior." As in *American Electric*, the parties seek to use parol evidence to show "the original parties had a broader-than-usual meaning in mind when they purposely included the word," *id.* Moreover, there is absolutely nothing in the agreement that even suggests it is meant as an addendum to the MSA, a document executed six years prior.

Superior and Wild Well argue that *American Electric* is distinguishable because "reformation of the contract at issue [in that case] would have been to the detriment of a third party." It is true that part of our reasoning in that case was that the requested reformation would hurt a third party. *See id.* at 287–88. But Superior and Wild Well do not explain how the alleged mistake—a failure to include language in the contract indicating that "Owner" referred not just to Superior, but also to any subsidiary it sold a vessel to—is "the type of 'error' that reformation is intended to remedy," *id.* at 288. To allow Superior and Wild Well, in spite of unambiguous contract language, to introduce

15

affidavits of its employees to show that the agreement was meant to include Wild Well and serve as an addendum to the MSA would most certainly be "an end-run around the parol-evidence rule . . . fram[ed] . . . as a request for reformation," *id.*

### b. Indemnity for Superior

Superior also argues that even if the VBA does not provide for Wild Well's defense costs, "Superior had to defend itself in this case against allegations that it was negligent as the owner of the D/B SUPERIOR PERFORMANCE." Therefore, Superior argues, it is entitled to defense costs for defending against these allegations. We disagree.

The opening paragraph of the VBA states that it was "executed by Contractor [Max Welders] for the purpose of obtaining access from Owner [Superior] to vessels owned, chartered and/or operated by Owner, to provide employees of Contractor with working, living or operating support aboard the vessels of Owner, and in order to allocate the risks and liabilities arising out of Owner granting to Contractor such access." This statement makes clear that the risks and liabilities that are the subject of the VBA are those that arise out of Superior allowing Max Welders' employees to live, work, and operate aboard vessels that are owned and/or operated by Superior. Reading the indemnity provision's coverage for "claims . . . asserted . . . on behalf of [Max Welders'] employees" in the context of the VBA's opening language, it is clear that the parties only intended indemnity for claims of employees that had access to Superior's vessels. There was no Superior-owned vessel involved in Wilcox's injury, and therefore the VBA does not provide for defense costs. The unambiguous language of the VBA does not show that the parties intended it to cover any suit in which a Max Welders employee mistakenly or frivolously claims that a vessel was owned by Superior.

No. 13-31281

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment as to Wilcox's Jones Act claims and Superior and Wild Well's indemnity claims.