United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 19, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 01-31420

SETH A. BECKER,

Plaintiff - Intervenor Defendant - Appellee,

v.

TIDEWATER, INC., ET AL.,

Defendants,

TIDEWATER INCORPORATED, TWENTY
GRAND OFFSHORE INCORPORATED,
TIDEWATER MARINE, L.L.C.,

Defendants - Third Party Plaintiffs -
Intervenor Defendants - Appellees -
Appellants,

R & B FALCON DRILLING USA, INC.,
PENTAL INSURANCE COMPANY, LTD.,
CERTAIN UNDERWRITERS AT LLOYD'S
INSURANCE CO.,

Defendants - Appellants,

HYDRA RIG,  a division of Tuboscope Vetco
International, L.P.,

Defendant - Third Party Defendant -
Third Party Plaintiff - Appellee,

HYDRADYNE HYDRAULICS, INC.,

Defendant - Third Party Defendant -
Appellee,

v.

COFLEXIP STENA OFFSHORE, INC.,

Defendant - Third Party Defendant

Appellee,

v.

BAKER HUGHES, INC., BAKER HUGHES
OILFIELD OPERATIONS, INC.,

Defendants - Intervenor Defendants -
Appellants,

and

BAKER OIL TOOLS, INC., a division of
Baker Hughes Oilfield Operations, Inc.,

Defendant - Third Party Defendant -
Intervenor Plaintiff - Third Party Plaintiff -
Appellant,

BAKER OIL TOOLS, a division of Baker
Hughes Oilfield Operations, Inc.,

Third Party Defendant - Appellant.

---------------------------------------------------------
Appeals from the United States District Court
for the Western District of Louisiana

---------------------------------------------------------

Before BENAVIDES, STEWART, and CLEMENT, Circuit Judges

BENAVIDES, Circuit Judge:

Before the Court are a number of issues stemming from the horrific ordeal of Seth A. Becker,

a young man catastrophically injured while at sea on a gravel-packing assignment at an offshore oil

rig. In a lawsuit involving multiple defendants and causes of action, the jury sitting in the district

court found for plaintiff, awarding him damages in excess of $43 million. A number of issues, the

most significant of which being whether plaintiff is a seaman under the Jones Act, 46 U.S.C. app. §

688 (2000), are before this Court on appeal. Because we determine that plaintiff is not a Jones Act

seaman, it is unnecessary to address all but one of the remaining issues. Accordingly, the matter must be, and is, remanded to the district court for proceedings not inconsistent with this opinion.

**I.**

This case concerns injuries sustained while at sea by plaintiff-appellee Seth A. Becker, a 22 year-old who had just finished the fourth year of a five-year program at Montana Tech University, where he was studying mechanical and petroleum engineering. For the summer of 1999, plaintiff accepted a full-time position working for defendant Baker Hughes, Inc. (Baker), as he had done the previous two summers.[1]

Plaintiff's internship began as the previous two had—plaintiff was assigned to land-based work. Specifically, Baker had planned that plaintiff engage and gain knowledge in a variety of areas over the course of the summer, including oil pumping, screen manufacturing for sand control, repairing fishing tools, and, apparently, foremost, learning directly from Baker's team of regional engineers. Of these activities, only the oil pumping assignments implicated vessels and boating. Still, despite Baker's largely land-based plan for plaintiff, a superior at Baker expressed hopefully that Baker would "try to get [plaintiff] out on a boat" at some point during the summer. Plaintiff spent the first two weeks of the internship working on land in Baker's shop, performing relatively basic tasks such as cleaning and checking equipment that had returned from the field. At a later point, plaintiff was offered the opportunity to observe a gravel-packing operation on a Vastar offshore fixed platform. Before this trip, plaintiff received some brief offshore safety and training information, which included videos, personal instructions, a written safety test, and water survival training. On the trip

---

[1] Baker's business encompasses providing a broad range of oilfield services and products to members of the petroleum industry.

to the platform, plaintiff was a passenger, although he engaged in work for Baker upon arriving at the platform. As plaintiff returned from this trip, Baker determined that its technology vessel, the M/V Republic Tide ("Republic Tide") needed two workers to replace two members of the requisite six-person crew who had served at sea for an extended period of time and were in need of time off. Baker assigned plaintiff to the Republic Tide, instructing him to "learn as much as you can." Despite plaintiff's intern status, the record reflects that he filled one of the required six positions on the Republic Tide, engaged in real work while onboard, and was treated no differently than the other workers on the vessel.

The Republic Tide was owned by defendant Tidewater, Inc., but had been time-chartered by Baker to service oil wells during gravel pack operations. Baker had used Tidewater's vessel as its offshore technology pumping vessel since November or December 1998 and had specially modified it, installing tanks, generators, pumps, and a high pressure winch system, which included a hydraulic power unit, reel, hydraulic piping, 300 feet of 6-1/2-inch steel coflex hose, and various other kinds of sophisticated equipment. This equipment, which was owned, operated, and maintained by Baker, permitted Baker to use the Republic Tide for high pressure pumping operations competitive with those of other vessels in the Gulf of Mexico.

For this particular mission on the Republic Tide, Baker scheduled a twelve-hour trip to the R&B Falcon/Cliffs Rig 153 ("Cliffs Rig 153"), located in the Gulf of Mexico and owned by defendant Cliffs Drilling Co. and operated by defendant R&B Falcon Drilling USA, Inc. (collectively "Falcon"). En route to Cliffs Rig 153, the master of the Republic Tide and Tidewater employee, Captain Daniel Givens, provided plaintiff a minimal orientation, which took no more than fifteen minutes and consisted only of the general safety instructions—for instance, the location of life preservers and

4

where to abandon ship.

Things began to go terribly wrong on the first day of the mission. When the Republic Tide arrived at Cliffs Rig 153, the vessel was unable to drop anchor successfully and therefore its location had to be maintained using bow-thrusters, a fact of which plaintiff and the other crew members were not notified. To begin preparing for the gravel pack operation aboard the rig, the Baker employees, including plaintiff, unwrapped the Republic Tide's coflex hose and ran it from the Republic Tide to Cliffs Rig 153. Although the winch system to which the hose was connected had a component manufacturer-installed emergency disconnect function, the manner in which the hose had been unwrapped would prevent this mechanism from triggering. There was no other way to disconnect the hose quickly and the record reflects that senior employees of Baker, Tidewater, and Falcon all recognized this potential danger.

To perform work on the rig, the Baker crew was lifted in a basket up to the rig floor. Shortly thereafter, the Republic Tide lost its bow-thrust and it became uncertain how long the vessel could hold its position. As a result, the coflex hose needed to be disconnected from the rig, and plaintiff and two other Baker employees were ordered to leave the rig floor and go to the main deck to perform this task. As plaintiff attempted to knock the coflex hose's connections loose, the Republic Tide began to move.

Second-in-command on the Republic Tide, Captain Steven Lachney, was at the helm as the vessel drifted. With the stern moored to the rig by two six-inch ropes, Captain Lachney saw the six-inch rope tied to the port stern snap. Without warning anyone, Captain Lachney powered the port engine in reverse and the starboard engine in forward, causing the six-inch rope tied to the starboard stern also to snap. This, in turn, caused the Republic Tide to surge away from the rig, jerking the

5

coflex hose tight and pinning plaintiff against the catwalk backstop. The Republic Tide continued to swing in the strong current and the thick coflex hose, which had pinned plaintiff, began sawing through his legs to the point that they were almost entirely severed from his body. After sustaining this injury and losing nine pints of blood, plaintiff, who had remained conscious throughout the ordeal, was evacuated.

Plaintiff spent six weeks in the hospital, where he almost died. The parties stipulated that plaintiff's total medical bills—including those incurred during his hospital stay—amounted to $487,920.48. During the time at the hospital, plaintiff's legs were amputated below the knee, leaving a great deal of scar tissue. Furthermore, plaintiff endured bone infections and will require additional surgeries on his legs, potentially culminating with above-the-knee amputations, which will exacerbate plaintiff's condition considerably. As a result of this accident, plaintiff suffers from post-traumatic stress disorder, chronic pain disorder, depression, low self-esteem, phantom pain, stump pain, neuropsychological, psychological, and emotional problems, short-term memory loss, concentration problems, sleep disturbances, and permanent brain damage due to his heavy loss of blood after the accident. Most, if not all, of these debilitations will persist and require ongoing treatment, counseling, and medication for the remainder of plaintiff's life, which doctors have projected will last into his seventies.

Plaintiff subsequently sued Baker pursuant to the Jones Act, 46 U.S.C. app. § 688 and, in the alternative, the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901-950 (2001). Plaintiff also filed suit against Tidewater, alleging a negligence claim under general maritime law and, in the alternative, under the LHWCA. Plaintiff also claimed that the Republic Tide was an unseaworthy vessel. Plaintiff further asserted negligence claims under general maritime law

6

against Falcon. Tidewater and two of its affiliates then asserted a third-party demand against Baker for contractual indemnity and defense under a pre-existing blanket charter agreement. Baker opposed Tidewater's motion on the ground that the agreement did not contemplate indemnity for Tidewater's gross negligence. Prior to the completion of discovery, the district court granted Tidewater's motion for summary judgment on its indemnity claim against Baker.

Plaintiff later amended his complaint to add as defendants Tidewater's underwriters, Pental Insurance Co. Ltd. and certain underwriters at Lloyd's ("Underwriters"). The Underwriters cross-claimed and filed a motion for summary judgment against Baker, asserting the same indemnity rights as Tidewater under the blanket time charter, which motion was granted.[2] Baker also filed a motion for summary judgment on the issue of plaintiff's seaman status, which motion was denied. Notwithstanding the district court's rulings to the contrary, Baker persisted in its refusal to defend and indemnify Tidewater and the Underwriters, and continued to fight application of the agreement's indemnity clause. Thus, Tidewater defended itself at trial, during which Baker attempted to prove Tidewater's gross negligence so as to avoid indemnification.

Faced with indemnifying Tidewater's liability, Baker filed third-party demands for products liability against Hydra Rig and Hydradyne Hydraulics for defects in the manufacture of the coflex hose and reel assembly installed on the Republic Tide. Plaintiff then amended his complaint to assert similar product liability claims against these companies, and against Coflexip Stena Offshore, Inc., the manufacturer of the coflex hose (collectively, "component manufacturers").

In the parties' joint submission of requested jury charges, Baker requested an instruction on

---

[2] At the time the Underwriters filed their motion, evidence had emerged in discovery that allegedly implicated Tidewater's gross negligence. Baker opposed the Underwriters' motion on the ground that Tidewater's gross negligence was still a disputed issue of material fact.

7

the issue of gross negligence, which was rejected. Baker also filed a motion asking the district court to reconsider the summary judgments granted to Tidewater and the Underwriters and urged its request for a jury charge on gross negligence. Again, this motion was denied. Baker also interposed a written objection to the line of the proposed verdict form allowing the jury to allot a separate amount of damages for "disfigurement and scarring," which objection was ultimately denied.

Over the course of trial, a number of other disputes arose, including that concerning the testimony of Jamie Parr, Baker's operations coordinator, as a witness for plaintiff's case-in-chief. The district court excluded testimony given by Parr as to what plaintiff's duties would be after the trip to the Cliffs Rig 153, because Parr admitted that he had no firsthand knowledge about Baker's future plans for plaintiff and also because Parr could not testify with certainty about the scope of plaintiff's future duties. Also controversial was the testimony of Captain Ronald Campana, an expert in vessel operations and boat-handling. The district court refused to allow a portion of Campana's report that Tidewater's senior employee, Ronald Frederick, had been "grossly negligent in the performance of his duties," because he determined that such a statement invaded the jury's ability to decide an ultimate issue.

All parties stipulated that plaintiff was an innocent victim and free from all fault. At the close of plaintiff's case, Baker moved for judgment as a matter of law on the issue of plaintiff's seaman status, which motion was denied. At the close of all evidence, the court bifurcated the issues. The jury was asked first to decide whether plaintiff was a seaman under the Jones Act. It determined that plaintiff indeed was a seaman. Once this threshold determination was made, the remaining jury instructions regarding liability and damages reflected that plaintiff was a seaman and did not contemplate the alternate theories of recovery that plaintiff pled, such as those under the LHWCA.

8

The jury then found that Baker was negligent under the Jones Act, the Republic Tide was unseaworthy and a substantial cause of plaintiff's injuries and that Tidewater and Falcon were negligent under general maritime law. The jury assigned 65 percent of the fault to Baker, 30 percent to Tidewater, and 5 percent of Falcon, although the parties were held to be jointly and severally liable. The jury found further that Coflexip, Hydradyne, and Hydrarig did not manufacturer a defective product and thus bore plaintiff no liability. The court also concluded that these companies were not liable to Baker.

The jury then awarded plaintiff $29 million in general damages, including $7 million for disfigurement and scarring.[3] The jury also awarded plaintiff $11 million in future medical and life care expenses, $3 million in future lost wages, and $56,000 in past lost wages. Judgment was entered in favor of plaintiff on the jury verdict and in favor of Tidewater and the Underwriters on the contractual indemnity claim. Baker timely moved for a new trial, or remittitur, arguing that the district court

---

[3] The breakdown for general damages was as follows:

| | |
|---|---|
| —past physical pain and suffering, including physical disability and impairment, past loss of enjoyment of life and inconvenience on the normal pursuits and pleasures of life | $5,000,000 |
| —future physical pain and suffering, including physical disability and impairment, future loss of enjoyment of life and the effects of the injuries and inconvenience on the normal pursuits and pleasures of life | $6,000,000 |
| —past mental anguish and suffering, as well as feelings of economic insecurity caused by disability | $5,000,000 |
| —future mental anguish and suffering, as well as feelings of economic insecurity caused by disability | $6,000,000 |
| —disfigurement and scarring | $7,000,000. |

9

erred in ordering Baker to indemnify Tidewater and the Underwriters, and that the award of damages

was excessive and constituted an abuse of discretion. These motions were denied. The judgment was

later amended to include judicial interest.

Presented for appeal are the following five issues:

(a)     whether the district court erred in assigning plaintiff seaman status under the Jones
        Act;
(b)     whether the district court erred in determining that there was sufficient evidence for
        finding Falcon 5 percent liable;
(c)     whether the district court erred by not remitting the jury's damages award;
(d)     whether the district court erred by finding no fault in the component manufacturers'
        conduct; and
(e)     whether the district court erred by determining that Baker must indemnify Tidewater.

## II.

### *A.*

The threshold issue brought forth on this appeal is whether plaintiff is a seaman under the

terms of the Jones Act, codified at 46 U.S.C. app. § 688. Specifically, at issue is whether the district

court erred by allowing the jury to decide whether plaintiff is a seaman, and thus entitled to protection

under the Jones Act, or whether he is a longshoreman and therefore under the auspices of the

Longshore and Harbor Workers' Compensation Act (LHWCA), codified at 33 U.S.C. §§ 901-950.

It is well-settled that the Jones Act and the LHWCA are "mutually exclusive compensation regimes."

*Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 553 (1997). *See also Chandris, Inc. v. Latsis*,

515 U.S. 347, 355-56 (1995). That is, if plaintiff satisfies the criteria for being a seaman, he is

covered by the Jones Act and not the LHWCA; if he does not, he is protected only by the LHWCA.

*See id.* at 355-58.

Although determination of whether an injured worker is a seaman under the Jones Act is a

10

mixed question of law and fact and it is usually inappropriate to take the question from the jury, judgment as a matter of law is mandated where the facts and the law will reasonably support only one conclusion. *See Papai*, 520 U.S. at 554. Here, plaintiff maintains that the issue of his seaman status was properly given to the jury. On the other hand, Baker asserts that plaintiff, as a matter of law, is not a seaman under the Jones Act and that plaintiff should be permitted to proceed only under the LHWCA.[4]

A brief summary of the two statutes' provisions and remedial schemes explains the litigation posture of the parties, particularly the cross-claims of the defendants, in this case. The Jones Act provides a cause of action permitting unlimited damages against the negligence of a plaintiff's employer. *Ferguson v. Moore-McCormack Lines*, 352 U.S. 521, 522-23 (1957). Specifically, the act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may... maintain an action for damages at law..., and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply...." 46 U.S.C. app. § 688(a). A Jones Act seaman may also sue the owner of any vessel on which he is working for a breach of the warranty of seaworthiness, regardless of whether the vessel is owned by his employer. *Parks v. Dowell Div. of Dow Chem. Corp.*, 712 F.2d

---

[4] Plaintiff contends that Baker has waived the argument that he is not a seaman as a matter of law by admitting, in response to plaintiff's post-trial motion for judgment, that seaman status was an issue of fact for the jury to determine. Any such statements, however, were uttered after the district court informed counsel that either it would hold that plaintiff is a seaman as a matter of law or the issue would go to the jury. After this choice was presented, Baker naturally argued, for the sake of that argument, that the issue of seaman status was a jury issue. Given this, and the fact that, with respect to this issue, Baker (i) filed a motion for summary judgment, (ii) moved for judgment as a matter of law at the close of plaintiff's case and at the close of all the evidence, and (iii) moved for judgment notwithstanding the verdict, Baker has preserved this argument. In any event, this Court is not required to treat any purported concession as binding, and we would choose not to do so here. *See Pool Co. v. Cooper*, 2745 F.3d 173, 185 (5th Cir. 2001).

11

154, 156-58 (5th Cir. 1983). Finally, a Jones Act seaman may also sue third parties for general maritime law negligence. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498 (1971).

In contrast, the LHWCA provides a cause of action for injuries sustained by a broad range of land-based maritime workers, excluding seamen covered by the Jones Act. *See Chandris*, 515 U.S. at 356. First, the LHWCA provides a no-fault workers' compensation scheme against a worker's employer for the death or disability of anyone engaged in maritime employment to receive medical costs, 33 U.S.C. § 907(a), prejudgment interest, *id.* § 905, and two-thirds of the worker's salary for as long as the disability persists. *Id.* § 908(a). Second, the LHWCA permits a restrictive theory of negligence against a vessel as a third party to recover damages for injuries caused by vessel negligence. 33 U.S.C. § 905(b). *See also Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981); Joseph D. Cheavens, *Terminal Workers' Injury and Death Claims*, 64 Tulane L. Rev. 361, 364 (1989).[5] An LHWCA plaintiff may also sue nonvessel third parties under general maritime law tort principles. *Melerine v. Avondale Shipyards*, 659 F.2d 706, 708 (5th Cir. 1981); *see also Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 977 (5th Cir. 1978).[6] An LHWCA worker, unlike a Jones Act seaman, does not have a cause of action for unseaworthiness. *See* 33 U.S.C. § 905(b). *See also Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 113 n.6 (1974) (Under the LHWCA, "an employee injured on a vessel can bring an action against the

---

[5] The LHWCA also provides for recovery against a worker's employer for vessel negligence if that employer is also deemed to be such. *See* 33 U.S.C. § 905(b); *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983).

[6] Recovery pursuant to general maritime law is available only from defendants outside the scope of the LHWCA's statutory scheme. *See* 33 U.S.C. § 905(b); *see also* 1 Thomas J. Schoenbaum, Admiralty and Maritime Law 156 & n.13 (2d ed. 1994) (noting that those covered by the LHWCA can only use general maritime law for claims against those outside the realm of the statute).

vessel for negligence, but the vessel's liability will not be based upon the warranty of seaworthiness or breach thereof."). Thus, whether plaintiff is a seaman determines which statutory scheme applies and, ultimately, the degree and extent to which each defendant may be liable.

To determine if an individual worker is a seaman, and therefore entitled to the protections of the Jones Act, the Supreme Court has established a two-prong test. First, "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Chandris*, 515 U.S. at 368. Second, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and nature." *Id.*

The Supreme Court in *Chandris* admitted that satisfying the first prong of the test is relatively easy: the claimant need only show that he "do[es] the ship's work." *Id. See also In re Endeavor Marine, Inc.*, 234 F.3d 287, 290 (5th Cir. 2000). This threshold requirement is "very broad," encompassing "all who work at sea in the service of a ship." *Chandris*, 515 U.S. at 368 (internal citations and quotation marks omitted). Here, it is clear that plaintiff satisfies this threshold requirement: he filled one of the Republic Tide's crew positions and engaged in the vessel's work while on board. Plaintiff, therefore, clears this initial Jones Act hurdle.

Turning to the second prong—whether plaintiff has a connection to a vessel in navigation that is substantial both in duration and nature—it is undisputed that the Republic Tide is a vessel in navigation. The only remaining question, then, is whether plaintiff's connection to the Republic Tide is substantial in duration and nature, therefore warranting coverage under the Jones Act. *See id.* Put differently, whether the jury erred in determining that plaintiff was a seaman turns on whether it had sufficient evidence before it to conclude that plaintiff was substantially connected to the Republic Tide. The requirement of a substantial connection to a vessel is intended "to separate the sea-based

13

maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation." *Id.* As the Supreme Court has noted,

> the total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of the vessels and the perils attendant thereon. The duration of the worker's connection to a vessel and the nature of the worker's activities taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time.

*Id.* at 370 (internal citations and quotation marks omitted). Importantly, this second prong constitutes a "status-based" standard—*i.e.*, "it is not the employee's particular job that is determinative [of seaman status], but the employee's connection to a vessel." *Id.* at 364. As a result, the Court speculated that under this standard even a ship repairman, who may know nothing about boating or sailing, could qualify as a seaman. *Id.* at 363-64. The Court expounded on this status-centric language in *Papai*, 520 U.S. at 555, noting that it matters whether "the employee's duties take him to sea" and that the Jones Act's coverage is confined to "those workers who face *regular* exposure to the perils of the sea." *Id.* at 560 (emphasis added). By invoking a status-based standard, the Court rejected, both explicitly and by necessary implication, a so-called "voyage test" in which "anyone working on board a vessel for the duration of a 'voyage' in furtherance of the vessel's mission has the necessary employment-related connection to qualify as a seaman." *Chandris*, 515 U.S. at 358.

While seaman status is not simply a temporal concept, the amount of time a worker spends aboard a vessel in navigation is helpful in determining if that worker has attained seaman status. *See id.* at 371. This circuit has quantified the duration of time necessary to allow submission of the issue

14

of seaman status to a jury by using a 30 percent rule of thumb. "[A]s a general rule, [a worker] must show [substantial duration] by demonstrating that 30 percent or more of his time is spent in service of that vessel." *Roberts v. Cardinal Servs. Inc.*, 266 F.3d 363, 375 (5th Cir. 2001). The Supreme Court endorsed this thirty-percent rule:

> Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases.... And where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict.

*Chandris*, 515 U.S. at 371.[7] Importantly, the Supreme Court has articulated an exception to temporal guidelines, such as our thirty-percent benchmark. *Id.* at 372. First, an employee who has worked for years in an employer's shoreside headquarters and who is then reassigned to a ship in a classic seaman's job qualifies for seaman status even if he is injured shortly after reassignment. *Id.* Second, a worker who has been reassigned to a land-based job cannot claim seaman status based on prior service at sea. *Id.* The Court summed up these two exceptions by noting that "[i]f a maritime employee receives a new work assignment in which his essential duties are changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new position." *Id.* Thus, a worker who, over the course of his employment, has worked in the service of a vessel in navigation well under thirty percent of his time may still qualify for seaman

---

[7] After *Chandris*, this circuit reaffirmed the 30-percent rule. In *Nunez v. B&B Dredging, Inc.*, 288 F.3d 271, 277 (5th Cir. 2002), it was held that because the plaintiff spent only approximately 10 percent of his work time aboard a vessel in navigation, he did not qualify for seaman status as a matter of law.

15

status if he has been reassigned to a new position that meets this temporal requirement. *See id.* It is this exception that plaintiff now tries to utilize, claiming that his assignment to the Republic Tide constituted the requisite fundamental change in his status.

This exception, however, creates a potential problem: any worker who works intermittently on vessels in navigation and who sustains an injury in the course of doing so will claim seaman status if he is injured while at sea. For instance, a worker whose duties sometimes take him to sea could claim that the start of each voyage establishes a reassignment to a sea-based position and that his return to shore again shifts his status back to a land-based worker. It appears that the Supreme Court attempted to preempt such arguments by specifically rejecting a "voyage test" of seaman status under which a worker could "walk into and out of coverage in the course of his regular duties." *Id.* at 363 (citing *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1075 (5th Cir. 1986)). Rather, the Court's opinion in *Chandris* contemplates that a change in coverage under the Jones Act occurs only when the status of the worker changes, not simply because a worker happens to serve on a vessel before returning to work on land. *See Chandris*, 515 U.S. at 563. Thus, for plaintiff to qualify for the Jones Act's protections, he must have undergone a substantial change in status, not simply serve on a boat sporadically. To give teeth to the *Chandris* opinion's rejection of a voyage test, it must be held that merely serving an assignment on a vessel in navigation does not alter a worker's status. If that were not the case, *Chandris* in fact *would* have established a voyage test. This conclusion is consistent with the language of *Chandris*, which instructs that "we do not believe that any maritime worker on a ship at sea as part of his employment is automatically a member of the crew within the meaning of the statutory scheme." *Id.* at 358.

Plaintiff attempts to fit himself into the first *Chandris* exception to the Fifth Circuit's general

16

30 percent temporal requirement. As plaintiff bears the burden of proof for establishing seaman status, he accordingly must show that he fits within the framework of *Chandris*.[8] He argues that although in the past he did not work on sea vessels at all (let alone for 30 percent of his time), he was assigned to the Republic Tide and, at that point, underwent a change in status and became a seaman. If we are to be persuaded by this theory, we would need to conclude that (i) when plaintiff was assigned to the Republic Tide, he was removed from his former position of land-based intern and assigned to a new, sea-based position, (ii) this reassignment permanently changed his status, and (iii) by serving in this new position, plaintiff would spend at least 30% of his time aboard a vessel.

On this record, the evidence is insufficient for a finder of fact to conclude that plaintiff has proven his status at Baker fundamentally changed when he was assigned to the Republic Tide. As such, no reasonable jury could conclude that, under Supreme Court and Fifth Circuit precedent, plaintiff is a Jones Act seaman. Indeed, the record indicates that the superiors at Baker had planned that plaintiff would gain exposure to a number of areas over the course of the summer, including oil pumping, screen manufacturing for sand control, fishing tools, and, apparently foremost, learning directly from regional engineers. The latter three of these duties, by plaintiff's own admission, have nothing to do with being on a vessel in navigation. Furthermore, the testimony indicates that plaintiff's assignment to the Republic Tide was not a fundamental change in status, but rather an opportunity presented to him during the course of the internship. Indeed, plaintiff testified that his superiors at Baker "would try to get me out on a boat." And, when the Republic Tide needed two

---

[8] *See Barrett v. Chevron, U.S.A., Inc.*, 752 F.2d 129, 132 (5th Cir. 1985) ("An injured person claiming the benefits of the Jones Act, 46 U.S.C. § 688 (1976), has the burden of establishing seaman status.") (citing *Bernard v. Binnings Const. Co., Inc.*, 741 F.2d 824 (5th Cir. 1984); *Billings v. Chevron U.S.A. Inc.*, 618 F.2d 1108, 1109 (5th Cir. 1980)).

17

men to replace two other workers who had been working for too many hours, plaintiff was assigned to fill in, being told to "learn as much as you can." Thus, the record paints a picture that plaintiff's placement onboard the Republic Tide was one of many activities to take place during the course of the summer. And, while it is impossible to know with complete certainty how events would have unfolded had plaintiff not suffered this terrible accident, there is absolutely no evidence that plaintiff's assignment served to alter Baker's overall plan for him, which comprised land-based work almost exclusively. Thus, plaintiff cannot carry his burden that he was reassigned from his job as a summer engineering intern to a regular and continuous sea-based employment position aboard the Republic Tide.

This conclusion withstands plaintiff's arguments to the contrary. In support of plaintiff's assertion that he is a seaman, plaintiff notes (1) his participation in an offshore training and safety course, (2) a one-day visit to a Vastar platform, (3) testimony that on his trip to the Falcon rig for the gravel-pack job he was as much a member of the crew of the Republic Tide as anyone else, and (4) his work aboard the vessel during the job. None of these arguments furthers plaintiff's assertion that his status had changed and that he became a Jones Act seaman. First, evidence that plaintiff was given training in offshore work and safety is not sufficient to establish seaman status. Even temporary workers have to be trained if they are expected to assist in the function or mission of the vessel. The idea that receiving training would create seaman status is inconsistent with the demands of *Chandris*, which holds that merely serving aboard a boat is not sufficient, in itself, to warrant seaman status. *See Chandris*, 515 U.S. at 361. And, one could contemplate situations in which individuals who are clearly not seamen—such as observers or guests—aboard a vessel would receive some safety training. Plaintiff's receiving safety training is therefore insufficient to establish seaman status.

18

Second, plaintiff's work on the Vastar platform does not establish seaman status. Fixed platforms are not vessels, and workers injured on them are covered under the LHWCA, not the Jones Act. *See, e.g., Demette v. Falcon Drilling Co.*, 280 F.3d 492 (5th Cir. 2002). Third, testimony that plaintiff was as much a part of the crew as any other person is insufficient to establish seaman status. Seaman status does not attach to a worker simply because he is necessary to the vessel's mission at the time of injury. *See Chandris*, 515 U.S. at 358. *Chandris* holds that temporary workers are not seamen, although such workers may be treated as regular crew members by their peers. *See id.*

Finally, the mere fact that plaintiff was ordered to work a crew position aboard the Republic Tide is not sufficient as a matter of law to establish a substantial connection to that vessel, absent evidence that his essential duties as an intern had changed. *See Chandris*, 515 U.S. at 358 (rejecting a "voyage test" under which anyone working on board a vessel for the duration of the voyage in furtherance of the vessel's mission would have necessary employment-related connection to qualify as seaman). Indeed, there is no evidence that plaintiff's planned activities were permanently changed or that his essential duties as an intern had been altered by his assignment to the Republic Tide. Plaintiff's mission aboard the Republic Tide was in fact neither planned nor permanent, despite the fact that he served as a necessary member of the crew and engaged in Baker's work. Rather, plaintiff's position on the Republic Tide arose by happenstance, to relieve two weary workers who needed rest. In light of the work plaintiff performed over his previous summer internships with Baker, and the work planned for him that summer, plaintiff's work aboard the Republic Tide does not constitute the kind of regular or continuous commitment of his labor to the service of that vessel that regularly exposed him to the perils of the sea within the meaning of *Chandris*.

Although it could be argued that plaintiff's merely being assigned to the Republic Tide is

19

evidence enough from which a reasonable jury could conclude that his status had changed, this argument fails for two reasons. First, it is clear from the record that Baker's plan for plaintiff may have included his being placed on a boat. Thus, plaintiff's assignment to the Republic Tide would not necessitate that the structure of plaintiff's largely land-based internship had been fundamentally altered. Second, if plaintiff's assignment to the Republic Tide constitutes sufficient evidence to conclude that plaintiff's status had changed, then the burden of proof would effectively be placed on defendants to prove that plaintiff would be transferred away from the vessel and that the assignment was only temporary, rather than requiring plaintiff to show that his status had changed. Such an outcome would be inconsistent with *Barrett*, which assigns the burden of proof to the plaintiff. *See Barrett*, 752 F.2d at 132.

Finally, this case is clearly distinguishable from our holding in *Manuel v. P.A.W. Drilling & Well Service, Inc.*, 135 F.3d 344, 352 (5th Cir. 1998). In *Manuel*, the plaintiff was injured while working full-time on defendant's vessel, as he had done for the duration of his employment with the defendant. There, the defendant claimed that because it was *possible* that the plaintiff might have been transferred to a land-based position at some point in the future, he could not be a Jones Act seaman. We rejected the defendant's argument, establishing that merely being "subject to reassignment [to a non-seaman role or status]... at some later time is of no moment" and does not in itself defeat a worker's prayer for seaman status. *Id.* Put differently, an employer's claim that an employee "could have been assigned to other work locations" does not preclude that employee's seaman status. *Id.* The facts here are distinguishable from those in *Manuel*. Here, plaintiff had engaged, and was scheduled to engage, in primarily land-based activities during the course of his employment at Baker. In short, plaintiff was a land-based worker who happened to be assigned to

20

a mission on a vessel; he was not a sea-based worker, like the plaintiff in *Manuel*, whose only connection to land-based employment was the mere possibility of being transferred to such a position at an indeterminate future date.[9]

Thus, circuit precedent and the Supreme Court's holdings in *Chandris* and *Papai* require the determination that plaintiff is not a seaman as a matter of law under the Jones Act. A reasoned review of the evidence compels only the conclusion that plaintiff was a land-based worker who had been assigned to a mission on a vessel at sea. And, merely serving on such a voyage does not warrant Jones Act protection. Reaching this conclusion does not mean that plaintiff was not a valued

_____

[9] Also at issue in this appeal is whether the district court properly excluded as speculative some of the testimony of Jamie Parr, Baker's operations coordinator, specifically Parr's claim that plaintiff's appointment to the Republic Tide was temporary. In the testimony that was excluded, Parr explained that workers were assigned to the crew position filled by plaintiff on a rotation system, and the practice was for them to leave the boat when the job was finished and return to the district office. It was possible that plaintiff might have been re-assigned to another vessel later, but only if his name happened to be placed at the top of the rotation schedule. Because Parr could not say with certainty that plaintiff would not have returned to the vessel in the future and because Parr could not testify with certainty about the scope of plaintiff's future duties, the district court excluded this testimony as speculation.

Plaintiff and Tidewater agree with the district court that this testimony was speculative because Parr could not testify with absolute certainty whether plaintiff would be sent back on a vessel or not. On the other hand, Baker notes that testimony about future events is not inadmissable unless it rises to the level of "dubious projections into the future or questionable surmises about what might have happened had the facts been different." 1 McCormick on Evidence § 185. As the operations coordinator, responsible for assigning workers on the Republic Tide, Parr would appear to have the requisite knowledge and foundation to testify about Baker's scheduling practices. His testimony was relevant and probative evidence under Rule 406, Fed. R. Evid., bearing on the total circumstances surrounding plaintiff's employment-connection to a vessel. Parr's excluded testimony supports the reasonable inference that plaintiff's assignment to the Republic Tide, and to Baker's fleet generally, was only temporary, and not substantial in duration, regular, or continuous. Accordingly, it would appear that the district court should not have excluded such testimony.

We need not find error here, however, because Parr's excluded testimony tends to prove that plaintiff is not a seaman. And, as we have concluded that plaintiff is indeed not a seaman, such excluded testimony becomes superfluous.

21

employee who engaged in difficult and, unfortunately, dangerous work. While it is all too apparent that plaintiff was exposed to the risks of working at sea, our precedent nevertheless instructs that "[s]eaman status is not coextensive with seaman's risks." *Chandris*, 515 U.S. at 361 (citing *Easley v. Southern Shipbuilding Corp.*, 965 F.2d 1, 4-5 (5th Cir. 1992)). Accordingly, the district court erred in allowing the issue of plaintiff's seaman status under the Jones Act go to the jury. Rather, because plaintiff is not a seaman under the Jones Act, the jury's finding to the contrary was improper.

## B.

The next question, then, is how to proceed after having determined that the district judge improperly permitted the jury to determine the issue of seaman status. As this matter should have proceeded as an LHWCA claim, rather than as a Jones Act claim, the district court must reevaluate plaintiff's claims in light of the rights and remedies available to LHWCA plaintiffs with respect to both liability and damages, keeping in mind the appropriate theories of recovery and the applicable standards of negligence.[10] It is, therefore, necessary to vacate the findings of liability against Baker, Tidewater, and Falcon, as the jury's instructions on liability and damages did not contemplate plaintiff's status as an LHWCA worker rather than a Jones Act seaman. Accordingly, this matter must be remanded for proceedings not inconsistent with this opinion.

---

[10] For instance, the LHWCA provides recovery pursuant to a no-fault compensation scheme against a plaintiff's employer. *See* 33 U.S.C. § 901 *et seq.* Furthermore, as Section 905(b) of the LHWCA permits recovery for vessel negligence, the district court will have to determine which defendant—or defendants—may be liable under this theory of negligence, rather than under other negligence doctrines such as that of general maritime law. Note that the standard of vessel negligence pursuant to Section 905(b) is different from that of negligence under the general maritime law. *See Pimental v. LTD Canadian Pacific Bulk*, 965 F.2d 13, 15 (5th Cir. 1992); *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 708 (5th Cir. 1981). Moreover, the LHWCA does not permit recovery based upon the doctrine of unseaworthiness. *See* 33 U.S.C. § 905(b). *See also Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 113 n.6 (1974).

*C.*

As the issue of liability and damages with respect to Baker, Tidewater, and Falcon should be vacated and remanded to the district court, only one of the remaining four issues on appeal need be addressed,[11] namely, whether the component manufacturers are liable to Baker. As an initial matter, it appears that Baker has waived any such claim against these parties. In its brief, Baker attempts to argue that the district court committed reversible error by refusing to allow expert testimony regarding design defects. Baker's brief, however, devotes only one paragraph to the issue and presents little, if any, in the way of argument. Baker asserts only that the district court's refusal to allow its expert to testify regarding alleged design defects in the reel and hose assembly was "reversible error," depriving Baker of "substantial rights as a litigant." Baker does not cite a single case in support of its position nor does it set forth the applicable standard of review. Baker's brief further provides no discussion explaining why the district court's determination constitutes reversible error. Furthermore, Baker does not clarify its claim that it was "deprived of substantial rights as a litigant," leaving the component manufacturers—and this Court—to speculate about the nature of the issues to be addressed. It appears clear that this argument has not been adequately raised and,

---

[11] The other three issues on appeal need not be addressed for the following reasons. First, the issue whether the jury had sufficient evidence to conclude that Falcon was negligent under general maritime law and therefore 5 percent accountable for plaintiff's injuries is now moot because the determination that plaintiff is a seaman was erroneous. Accordingly, Falcon, the owner of Cliffs Rig 153, may have to be pursued under the terms of Section 905(b) of the LHWCA for vessel negligence, not under general maritime law. Second, now that it is established that the LHWCA governs, the question whether Baker must indemnify Tidewater must be considered anew, as the LHWCA states, *inter alia*, that an employer, such as Baker, "shall not be liable to [a] vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void." 33 U.S.C. § 905(b). *See also In re ADM/Growmark River System, Inc.*, 234 F.3d 881, 889 (5th Cir. 2000). Finally, the question of whether damages should be remitted is rendered moot as the liability of Baker, Tidewater, and Falcon has been vacated.

23

as such, is deemed waived.  *See Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1045 (5th Cir. 1998); *Melton v. Teachers Insurance and Annuity Ass'n of America*, 114 F.3d 557, 561 (5th Cir. 1997).

## III.

Thus, we reverse the district court's decision allowing the jury to determine whether plaintiff is a Jones Act seaman and hold that plaintiff is not a seaman as a matter of law.  Accordingly, we vacate the findings of liability and damages with respect to Baker, Tidewater, and Falcon and remand this case to the district court so that the matter may proceed as an LHWCA case in a manner not inconsistent with this opinion.[12]  We affirm the determination that the component manufacturers are not liable to Baker.  These holdings render moot all other remaining issues on appeal.

---

[12] Accordingly, the motion filed by Falcon seeking permission to file a supplemental brief that pertains to damages issues is dismissed as moot.